IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


TIMOTHY DONNELL SATCHELL                                             PLAINTIFF


        v.                              Civil No. 06-5231


CAPTAIN HUNTER PETRAY, Jail Administrator;
FORMER JAIL NURSE SUE McDONALD;
and DR. HUSKINS                                                     DEFENDANTS


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

        The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro*

*se* and *in forma pauperis*.

        Plaintiff is currently incarcerated in Arkansas Department of Correction.  The events at

issue in this lawsuit occurred while the plaintiff was incarcerated at the Benton County Detention

Center. Plaintiff contends he was denied adequate medical care.

        Defendants filed a summary judgment motion (Doc. 21).  To assist plaintiff in responding

to the motion, a questionnaire was propounded (Doc. 24).   Plaintiff filed a response to the

questionnaire (Doc. 26).  The summary judgment motion is before the undersigned for issuance

of this report and recommendation.

                                **Background**

        On July 12, 2006, Satchell was booked into the Benton County Detention Center (BCDC)

on aggravated robbery charges.  *Plaintiff's Response* (Doc. 26)(hereinafter *Resp.*) at ¶ 1.  As part

of the booking process, he completed a medical questionnaire on which he indicated he was a

                                    -1-

diabetic and taking pills. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1 at page 6; *Resp.* at ¶ 2 (without knowledge to agree or disagree). He also completed an inmate medical insurance information form and signed an inmate telephone system notice form. *Defts' Ex.* 1 at pages 7 & 9; *Resp.* at ¶ 3 (without knowledge to agree or disagree).

His medical history includes admission to Northwest Hospital Center on February 23, 2003, for shortness of breath and heart palpations. *Resp.* at ¶ 4. After cardiac studies, hematology, and urinalysis were conducted, he was discharged with a diagnosis of atrial fibrillation and instructions to take aspirin and Cardizem. *Id.*

His medical history includes an examination at Beaufort County Hospital on September 17, 2004, for an irregular heart rate and shortness of breath. *Resp.* at ¶ 5. The diagnostic impression was listed as atrial fibrillation with rapid ventricular response. *Id.* He was treated with toprol and discharged the same day. *Id.*

On July 19, 2006, Satchell submitted a request to be seen by a doctor. *Defts' Ex.* 4 at page 27; *Resp.* at ¶ 6 (without knowledge to agree or disagree but did seek emergency assistance due to shortness of breath and heart racing). Satchell was seen by Dr. Neil Mullins on July 20th. *Defts' Ex.* 3 at page 16. He reported being a diabetic and stated he took one pill a day but didn't know the name of the pill. *Id.* Dr. Mullins named several pills and Satchell could not recall it. *Id.*

Satchell told Dr. Mullins he could not drink the water at the BCDC because he had never drank room temperature water before. *Defts' Ex.* 3 at page 16; *Resp.* at ¶ 8. Satchell also complained that he didn't like the powdered milk. *Id.*

-2-

Dr. Mullins examined Satchell and found his lungs to be clear. *Defts' Ex.* 3 at page 16; *Resp.* at ¶ 9 (without knowledge to agree or disagree). Satchell's blood sugar level was 106 three hours after his meal which was perfectly normal. *Id.*

According to Dr. Mullins notes, he decided to do a "2HPP sugar two times a week for two weeks." *Defts' Ex.* 3 at page 16. He encouraged Satchell to drink the water even though it was warm. *Id.* He also encouraged Satchell to drink the milk. *Id.* He didn't believe Satchell should be able to tell any difference between regular milk and powdered milk. *Id.* He wasn't going to change the diet for Satchell. *Id.*

According to Satchell, Dr. Mullins told him that he would have to deal with the conditions of drinking the water because he was incarcerated. *Resp.* at ¶ 10. Further, Satchell states he recalls only getting his blood sugar checked one or twice after the visit with Dr. Mullins. *Id.*

On August 19, 2006, Satchell submitted a grievance stating that he was dehydrated and had been hospitalized for this problem in the past. *Resp.* at ¶ 12. He stated he was dizzy and fatigued. *Id.* He indicated he drank sink water as often as he could. *Id.* He also submitted a medical request on August 19th stating he was dehydrated. *Id.* at ¶ 13.

Satchell was seen by Nurse McDonald on the 21st. *Defts' Ex.* 3 at page 15; *Resp.* at ¶ 14 (without knowledge to agree or disagree). She checked his blood sugar level and it was 143. *Id.* She also examined him and noted no dehydration on examination. *Id.* Satchell states he cannot recall what his blood sugar level was but he does recall her just verbally telling him he did not look dehydrated and sending him back to his cell. *Resp.* at ¶ 14.

AO72A
(Rev. 8/82)

On August 21st Satchell submitted a grievance about being dehydrated and a diabetic. *Defts' Ex.* 4 at page 24; *Resp.* at ¶ 15 (without knowledge to agree or disagree). He stated he had seen the nurse and she didn't seem to want to address his issues. *Id.* He stated that he could prove in a court he had been diabetic for two years. *Id.* He requested some real medical attention. *Id.* In response, Petray said he would forward the grievance to medical. *Id.*

On August 22nd Satchell submitted another grievance about dehydration. *Defts' Ex.* 4 at page 23; *Resp.* at ¶ 16. He indicated he was exhibiting the same symptoms he had when he was hospitalized. *Id.* He said he was light headed, fatigued, and had constant dry mouth. *Id.* He said the nurse didn't seem to want to do anything about his situation. *Id.* In response, Petray stated he would forward the grievance to the medical staff. *Id.*

On August 29th the nurse checked Satchell's blood sugar and it was 175. *Defts' Ex.* 3 at page 15; *Resp.* at ¶ 17 (without knowledge to agree or disagree). On August 29th Satchell submitted a grievance about being diabetic. *Defts' Ex.* 4 at page 22; *Resp.* at ¶ 18. He stated he had visited the nurse and she checked his blood sugar and it was 176. *Id.* He indicated she told him that whoever said he was diabetic was wrong. *Id.* He indicated that 176 was way over normal and he was writing the grievance to document this. *Id.* Petray stated he would forward Satchell's grievance to medical. *Id.*

On August 29th Dr. Mullins prescribed glucophage for Satchell. *Defts' Ex.* 3 at page 15; *Resp.* at ¶ 19 (without knowledge to agree or disagree). On September 1st Satchell was placed on a diabetic diet. *Resp.* at ¶ 20.

On September 13th Satchell submitted a medical request asking for a diabetic snack. *Resp.* at ¶ 21. His request for a snack was refused because he had been refusing his diabetic

-4-

medication. *Id.* at ¶ 22. According to Satchell, after he took the pills a few times his blood sugar was continuously getting way too low to the point that he was getting light headed and dizzy. *Id.* at ¶ 23. He states he told "them" the pills were either too strong for him or the wrong type. *Id.* When the medical staff took no action in response, Satchell indicates he stopped taking the pills. *Id.*

On September 20th Satchell asked to see the doctor because of severe back pain. *Resp.* at ¶ 24. He was seen by Dr. Mullins on September 21st. *Defts' Ex.* 3 at page 15; *Resp.* at ¶ 25 (without knowledge to agree or disagree). Satchell told Dr. Mullins he thought the back pain was caused by his kidneys. *Defts' Ex.* 3 at page 14. Satchell recalls telling Dr. Mullins the pain was mainly from dehydration. *Resp.* at ¶ 25.

Satchell's straight leg raising test was negative. *Defts' Ex.* 3 at page 14. He told Dr. Mullins the pain was in his lower back not his side. *Id.* *See also Resp.* at ¶ 26. Satchell gave a history of not drinking much liquid. *Id.* He indicated he didn't drink water. *Id.*

Dr. Mullins told Satchell to drink more water. *Defts' Ex.* 3 at page 14. Dr. Mullins prescribed Ibuprofen for ten days. *Id.* Satchell indicates he told Dr. Mullins he could not seem to drink enough water because he was not used to drinking room temperature water. *Resp.* at ¶ 27. Satchell also stated he couldn't stand "soy milk" because it made him sick. *Id.*

On September 25th Satchell again asked to see the doctor due to severe back pain. *Resp.* at ¶ 28. He was seen by Dr. Mullins on September 26th. *Id.* at ¶ 29. He complained of back pain and said he was getting dehydrated. *Id.* In fact, Satchell states he told Dr. Mullins he was constantly dehydrated. *Id.*

-5-

According to Dr. Mullins' notes, Satchell indicated he did not like drinking out of the fountain. *Defts' Ex.* 3 at page 13. Dr. Mullins agreed to give Satchell a Styrofoam cup to encourage him to drink more water. *Id.* Dr. Mullins continued the Ibuprofen for ten days. *Id.*

According to Satchell, he told Dr. Mullins the water they had to drink out of the sink was warm and unsanitary because sixty-four inmates who used the day-room washed their hands in the sink. *Resp.* at ¶ 30. Satchell states Dr. Mullins finally gave him a cup to "drink water from the water cooler that the deputies use to give the inmates while taking their pills." *Id.*

On October 24th Satchell submitted a medical request asking to have his blood sugar checked. *Resp.* at ¶ 31. He was instructed to see the nurse. *Id.* His blood sugar was checked on October 26th and it was 133. *Defts' Ex.* 3 at page 12; *Resp.* at ¶ 32 (without knowledge to agree or disagree). His blood sugar was checked again on November 1st and was 116. *Defts' Ex.* 3 at page 12; *Resp.* at ¶ 33 (without knowledge to agree or disagree).

On November 7th Satchell submitted a request to have his blood sugar checked. *Defts' Ex.* 3 at page 12; *Resp.* at ¶ 34 (without knowledge to agree or disagree). It was checked on the 8th and was 137. *Id.* Satchell was put on the list to receive a night-time snack. *Id.*

Satchell states he only recalls feeling light headed at nights and very hungry because he received little food. *Resp.* at ¶ 34. He indicates he was on a diet tray. *Id.* However, he states he did receive a night snack to justify the light meal. *Id.*

His blood sugar was checked on November 15th and was 91. *Defts' Ex.* 3 at page 12. Satchell recalls his blood sugar being low due to hunger but does not recall what it was. *Resp.* at ¶ 35.

AO72A
(Rev. 8/82)

On November 21st Satchell submitted a request to have his blood sugar level checked, his weight checked, to be checked for dehydration, and because he was having back pains. *Resp.* at ¶ 36. In response, Petray said he would forward Satchell's request to medical. *Id.*

Satchell's lab work was done on November 28th. *Defs' Ex.* 3 at page 11; *Resp.* at ¶ 37(A) (without knowledge to agree or disagree). On December 4th Satchell submitted a grievance stating his heart problem was completely ignored. *Resp.* at ¶ 37(B). He stated he had heart problems on December 3rd and he went to pod control immediately. *Id.* He stated he was pushed off until December 4th but then he was totally ignored on the 4th. *Id.* In response, Petray stated he would forward Satchell's grievance to medical. *Id.*

Satchell was asked to describe what type of heart problems he was having on December 3rd. *Resp.* at ¶ 37(C). He indicates his heart starting racing non-stop especially when he was walking. *Id.* He also indicated his breathing became very short. *Id.* He indicates it was like that all day. *Id.* When he requested emergency assistance, he was first told to go back to his cell until morning. *Id.* Then after standing around for twenty minutes he was told they called the doctor and he said for Satchell to stay in bed until the next day. *Id.* Satchell was told the doctor said he would be all right until morning. *Id.* The next day, Satchell states no one called for him. *Id.* When he asked questions about where the doctor was, Satchell indicates he was told the doctor has already came and left for the day. *Id.* At this point, Satchell indicates he filed his December 4th grievance. *Id.*

Satchell was seen by Dr. Huskins on December 6th. *Defs' Ex.* 3 at page 10. He noted Satchell had went from 255 pounds down to 218 pounds. *Id.* Dr. Huskins also noted that three years ago Satchell had a history of palpitations that had been treated with beta blockers. *Id.*

-7-

Satchell reported some dizziness. *Id.* Dr. Huskins noted Satchell had a clear chest, no heart murmurs, and a build up of wax in his ears. *Id.* Dr. Huskins prescribed Lopressor and Cerumenex ear drops. *Id.*

Satchell recalls weighing under 200 pounds at the time of this appointment. *Resp.* at ¶ 38. He believes he weighed 196 pounds. *Id.* Satchell does not recall Dr. Huskins "thoroughly reviewing my heart either." *Id.*

Satchell submitted a grievance dated December 6th in which he stated that his heart problems were completely ignored. *Defts' Ex.* 4 at page 14; *Resp.* at ¶ 39(A) (without knowledge to agree or disagree). He indicated that last night he had gotten sick and was vomiting and asked for immediate assistance and had gotten pushed off. *Id.* In response, Petray said he would forward his request to medical. *Id.*

Satchell was asked to explain why he said his heart was completely ignored when he had just been seen by Dr. Huskins and prescribed medications. *Resp.* at ¶ 39(C). He responded as follows: (1) at the time of the emergency he was pushed off without being seen; (2) Dr. Huskins did not see him the very next day; and (3) he did not recall getting a thorough evaluation of what his heart was experiencing the day the event happened. *Id.*

Nurse Garrett wrote on the bottom of the grievance that Satchell had been prescribed medication for his heart and blood pressure and was refusing to take it. *Defts' Ex.* 4 at page 14. Satchell was asked to explain why he was refusing to take the medication Dr. Huskins prescribed for him. *Resp.* at ¶ 39(D). He responded as follows:

> The medical staff had a habit of prescribing things without even evaluating you. After the incident where I was given pills for my diabetes that were obviously "too strong" and made me sick, I felt that the medical staff at BCJ was too

incompetent to deal with prescribing me something for a serious situation such as my heart.

*Id.*

On December 12th Satchell submitted a request to have his blood sugar checked. *Defts' Ex.* 4 at page 13; *Resp.* at ¶ 40 (without knowledge to agree or disagree). It was scheduled to be checked the following day. *Id.*

On January 16, 2007, Satchell submitted a grievance stating he needed medical attention for his back. *Resp.* at ¶ 41. In response, Petray stated the doctor made all medical decisions. *Id.* If Satchell had medical problems, he was told to fill out a medical. *Id.*

On January 17th Satchell was placed on a vegetarian diet. *Resp.* at ¶ 42. On January 17th he submitted a medical request to see the doctor for heart and back problems. *Defts' Ex.* 4 at page 11; *Resp.* at ¶ 43 (without knowledge to agree or disagree but does recall periodically experiencing heart problems and shortness of breath).

Satchell was seen by Dr. Huskins on January 17th. *Resp.* at ¶ 44. Dr. Huskins ordered a repeat of Satchell's lab work and an EKG. *Id.* Dr. Huskins also sent for Satchell's medical records from Northwest Hospital and Beaufort County. *Id.*

On January 17th Satchell submitted a medical request asking to re-visit the nurse for a correction in his special diet. *Defts' Ex.* 4 at page 10; *Resp.* at ¶ 45 (without knowledge to agree or disagree). On January 19th a night-time snack was added to his diet. *Resp.* at ¶ 46.

On February 1st Satchell submitted a request asking to visit the doctor about serious medical issues that needed to be addressed immediately. *Resp.* at ¶ 47. On February 1st Satchell submitted a second medical request asking to see the nurse or doctor about a head cold and nose bleeds. *Defts' Ex.* 4 at page 9; *Resp.* at ¶ 48 (without knowledge to agree or disagree).

AO72A
(Rev. 8/82)

Satchell was seen by Nurse Garrett that day. *Resp.* at ¶ 49. He told her he couldn't breathe, had a runny nose, and his heart was fluttering. *Id.* He was prescribed Benadryl. *Id.*

Satchell was seen by Dr. Huskins on February 2nd. *Defts' Ex.* 3 at page 5; *Resp.* at ¶ 50 (without knowledge to agree or disagree). Satchell complained of back pain. *Id.*

On February 5th Satchell submitted a grievance stating that the deputies were not qualified to pass out medication. *Resp.* at ¶ 51(A). He stated he had refused his medication several times because they did not know what they were giving him. *Id.*

When medication is passed out there is a medication card the inmate must sign. *Resp.* at ¶ 51(B). The card lists the medication and the dosage but does not indicate what condition the medication has been prescribed for. *Id.* Satchell asserts he was taking more than one pill and he questioned whether they could be mixed or not. *Id.* The deputy replied that he did not know that he merely passed it out. *Id.*

On February 8th Satchell submitted a request asking to see the doctor about ear pains and loss of hearing. *Resp.* at ¶ 52(A). On February 11th he submitted a medical request asking to see the nurse about his diet and weight loss. *Defts' Ex.* 4 at page 6; *Resp.* at ¶ 52(B) (without knowledge to agree or disagree).

Satchell was seen by Dr. Huskins on February 12th. *Resp.* at ¶ 53. He noted Satchell had earwax buildup in both ears with the left ear bothering him more than the right. *Id.* Dr. Huskins started Satchell on Cerumenex weekly. *Id.*

On February 16th Satchell asked to be put on a regular tray just lactose free. *Resp.* at ¶ 54. Nurse Garrett authorized this change in Satchell's diet. *Id.* at ¶ 55.

-10-

On March 8th Satchell requested to see the doctor about his irregular heartbeat. *Resp.* at ¶ 56. On March 9th Satchell submitted a medical request asking to see the doctor about his irregular heartbeat. *Defts' Ex.* 4 at page 3; *Resp.* at ¶ 57 (without knowledge to agree or disagree but then commenting he remembered constantly having irregular heart beats and him blowing me off or not thoroughly evaluating me). Satchell said he hadn't seen the doctor about this issue yet. *Id.*

When Dr. Huskins called on March 12th Satchell refused to come out of his cell to be examined. *Resp.* at ¶ 59(A). Satchell was asked to explain why he refused to be seen by Dr. Huskins. *Id.* at ¶ 59(B). Satchell replied:

> After the past negligence of him handling my emergency situation, him constantly telling me I'm fine but yet my heart was occasionally racing, I felt that this man wasn't who I needed to see for help with my problems. I needed <u>real</u> medical attention, not to be brushed off again.

*Id.*

All decisions about Satchell's medical care at the BCDC were made by the jail medical staff. *Resp.* at ¶ 60. Satchell received all medical care and treatment prescribed to him by the jail medical staff. *Id.* at ¶ 61. All orders of the jail medical staff were carried out by personnel at the BCDC. *Id.* at ¶ 62.

Satchell was asked to explain how he believed Captain Petray exhibited deliberate indifference to his serious medical needs, he responded:

> Mr. Petray is the jail administrator and has authority to allow the nurse to pass out medication because she's certified and can answer any questions asked by the inmates because she's certified to do so. She can also properly distribute medication without an inmate having to worry about an overdose or mixing medication. I would assume he is also in charge of how they respond to medical emergencies in the jail. The proper process & procedure during an emergency. If I were to have had a heart attack or died, the fact that no doctor saw me or that

-11-

my heart problem wasn't treated as an emergency "having" a history of heart problems was a violation of my constitutional rights and to me considered as cruel & unusual punishment.

*Resp.* at ¶ 63.

With respect to Nurse McDonald, Satchell maintains she showed deliberate indifference with respect to his diabetes. *Resp.* at ¶ 64. He indicates his blood sugar was constantly higher than normal and he was willing and able to provide proof of his diabetes. *Id.* He indicates he was ignored and pushed off from getting a diabetic tray and medication until he "threatened with a grievance and legal action." *Id.*

Satchell was asked how Dr. Huskins exhibited deliberate indifference to Satchell's serious medical needs. Satchell responded:

Mr. Huskins did not take my medical problems as emergencies nor priorities. That was showed by him not seeing me the very next day after I had been put on bed rest by the officers. I saw him numerous times for the same issues and was not thoroughly looked at to determine the problem. It took several visits just to get a EKG done to my heart which was only conducted about 5 minutes by a nurse at his office during a time my heart was feeling alright.

*Resp.* at ¶ 65. Satchell believes Dr. Huskins did what was convenient for him and "pushed [Satchell] along" until he left Dr. Huskins' care and went to prison. *Id.* at ¶ 66.

Satchell suffered no physical injury as a result of a delay in his receiving medical care while at the BCDC. *Resp.* at ¶ 69. Satchell's main issue is that he was not taken to the emergency room the day his heart was racing. *Resp.* at page 40. He maintains he suffered much pain and was merely instructed to lay in his cell. *Id.* He points out he had already been diagnosed by freeworld physicians and still given a hard time about receiving proper treatment. *Id.*

-12-

## Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment. First, defendants argue they are being sued in their official capacities only. As there is no evidence of an unconstitutional custom or policy, they contend they are entitled to judgment in their favor. If the complaint is construed to include individual capacity claims, defendants alternatively argue there is no evidence of deliberate indifference to plaintiff's serious medical needs. Finally, defendants argue there is no

-13-

basis on which Captain Petray can be held liable as he was not personally involved in making any decisions regarding Satchell's medical care.

### *Individual versus Official Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

-14-

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). *See also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

At the same time, we are charged with liberally construing pro se complaints. *See e.g. Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)(requirement that pro se complaints be construed even more liberally than counseled pleadings); *White v. Wyrick*, 530 F.2d 818, 819 (8th Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief"). *See also, Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997)(complaint against state officials who were sued in their official capacities was deemed amended to assert personal capacity claims, where plaintiff moved to amend

-15-

complaint in response to motion for summary judgment). We will therefore construe the complaint to be asserting both individual and official capacities claims.

### *Denial of Medical Care*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of

AO72A
(Rev. 8/82)

a constitutional violation." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 498 (8th Cir. 2008).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

In this case, Satchell maintains Dr. Huskins exhibited deliberate indifference when he: did not come to the jail on December 3rd when contacted by jail personnel about Satchell complaining of "heart" problems; did not have Satchell transported to the emergency room for evaluation on December 3rd; did not evaluate Satchell at the jail on the following day; and when Dr. Huskins did perform an evaluation of Satchell, he does not believe it was thorough and/or included the proper tests. Satchell also questions the medication ordered by Dr. Huskins.

In this case, Satchell was treated first by Dr. Mullins and then Dr. Huskins on several occasions, certain tests were ordered, and Satchell was prescribed medication. *Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997)(prison doctors were not deliberately indifferent where they treated prison on numerous occasions and offered sensible medication and treatment). Satchell refused to take some of his prescribed medication and on one occasion refused to be treated by Dr. Huskins.

"[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment."

-17-

*Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)(citation omitted). The type of medication to prescribe, the tests to be ordered, and the appropriate treatment for a given medical condition all involve the exercise of medical judgment. Satchell's mere disagreement with Dr. Huskins' decisions is not the basis for § 1983 liability. *See e.g., Meiur v. Greene County Jail Employees*, 487 F.3d 1115, 118-19 (8th Cir. 2007). *See also Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992)("[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.").

Similarly, with respect to Nurse McDonald, Satchell maintains she failed to understand that his blood sugar was higher than normal and "pushed off" giving him a diabetic tray and medication. *Resp.* at ¶ 64. Satchell was booked into the BCDC on July 12th. He was seen by Dr. Mullins for the first time on July 20th and Dr. Mullins tested Satchell's blood sugar level and found it to be perfectly normal. *Defts' Ex.* 3 at page 16. Satchell could not recall the diabetes medication he had reportedly been taking. *Id.* Dr. Mullins ordered Satchell's blood sugar to be taken two times a week for two weeks. *Id.*

Between July 20th and August 20th, it does not appear Satchell submitted any medical requests. A chart notation indicates his blood sugar level was checked on July 26th by Nurse McDonald. *Defts' Ex.* 3 at page 15. From the chart notations, it does not appear to have been checked again until August 21st. *Id.*

Satchell's blood sugar level was tested again by Nurse McDonald on August 29th. *Defts' Ex.* 3 at page 15. On August 29th, Dr. Mullins prescribed glucophage. *Id.* On September 1st a diabetic diet was prescribed. *Id.* Satchell's request for a diabetic snack was refused because

-18-

he was refusing the glucophage. *Resp.* at ¶ 22. Satchell believed the medical was the wrong type or too strong so he quit taking them. *Id.* at ¶ 23.

At most, the court believes the evidence shows Nurse McDonald may have been negligent in failing to follow through on Dr. Mullins' orders. However, "[m]edical malpractice alone . . . is not actionable under the Eighth Amendment." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008). "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence. . . . Deliberable indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id.* (citations and internal quotation marks omitted).

With respect to the alleged delay in Satchell's receiving medical care following his complaint of having heart problems on December 3rd, he indicates jail staff contacted the doctor and followed his instructions to have Satchell placed on bed rest. *Resp.* at ¶ 37(C). Satchell suffered no physical injury as a result of a delay in his receipt of medical care. *Id.* at ¶ 69.

"[A]n inmate who claims that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995). *See also Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(when inmate alleges that delay in treatment rise to level of Eighth Amendment violation, objective seriousness of deprivation should be measured by effect of delay, and to establish this effect inmate must place verifying medical evidence in record). Here, Satchell suffered no injury as a result of the delay in his receipt of medical treatment. *Resp.* at ¶ 69. He has submitted no medical evidence

AO72A
(Rev. 8/82)

establishing the detrimental effect of the delay. *Id.* His claim involving the alleged delay in treatment following his December 3rd request for treatment therefore fails as a matter of law.

With respect to Captain Petray, there is no evidence he was personally involved in making any decisions regarding Satchell's medical care. Instead, Captain Petray merely responded to grievances submitted by Satchell and referred those grievance to the medical staff or told Satchell he was required to submit a medical request. In connection with the procedures used to pass out medication, Satchell's claim is premised solely on the fact that medically trained personnel do not pass out the medication. This does not state a claim of constitutional dimension. *See e.g., Booker v. Herman*, 2006 WL 2457230, *5 (N.D. Ind. Aug. 22, 2006)("While it might be a good practice, tradition, or even state law to require that only medical staff can deliver medication, the Constitution does not prohibit guards from distributing medication to inmates. This allegation states no claim upon which relief can be granted").

In connection with the December 3rd request for emergency medical treatment, Satchell indicates that the doctor was consulted and he is the one who advised the jailers to merely have Satchell returned to his cell and put on bed rest. *See Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility). Therefore, the reason emergency medical treatment was not provided was because jail medical personnel determined it was not necessary. There is simply no basis on which Captain Petray can be held liable. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535-36 (8th Cir. 1999).

-20-

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 21) be granted.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of August 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)